**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| EDWARD SONNENLITTER, | ) | CASE NO. 1:12-cv-0043 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | MEMORANDUM OF OPINION |
| | ) | AND ORDER |
| Defendant. | ) | |

This case is before the magistrate judge by consent.  Plaintiff, Edward

Sonnenlitter ("Sonnenlitter"), challenges the final decision of the Commissioner of Social

Security ("Commissioner") denying Sonnenlitter's application for a period of Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i),

and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  For the reasons given below, the court **AFFIRMS** the decision of the

Commissioner.

I.  Procedural History

Sonnenlitter filed an application for DIB and SSI on March 14, 2007, alleging

disability as of June 30, 2006.  His application was denied initially and upon

reconsideration.  Sonnenlitter timely requested an administrative hearing.

Administrative Law Judge Peter Beekman ("ALJ") held a hearing on October 21,

2010.  Sonnenlitter, represented by counsel, testified on his own behalf at the hearing.

The vocational expert, Deborah Lee ("VE") did not appear at the hearing but responded to interrogatories.  The ALJ issued a decision on January 14, 2011, in which he determined that Sonnenlitter is not disabled.  Sonnenlitter requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on November 9, 2011, the ALJ's decision became the final decision of the Commissioner.

Sonnenlitter filed an appeal to this court on January 7, 2012.  Sonnenlitter alleges that the ALJ (1) erred in determining that Sonnenlitter's prior drug and alcohol use was material to the determination of disability and (2) improperly assessed Sonnenlitter's residual functional capacity ("RFC").  The Commissioner denies that the ALJ erred.

## II.  Evidence

A.    *Personal and Vocational Evidence*

Sonnenlitter was born on December 14, 1963 and was 43 years old on the date of the alleged onset of disability.  He has a high school education and past relevant work as an inspector, truck loader, laborer, forklift operator, cook/prep cook, dishwasher, mixer, driver, and landscaper.

B.    *Medical Evidence*

Sonnenlitter has a history of depression since childhood and was receiving treatment in early 2007 from Dr. Dwight Coleman.  Transcript ("Tr."), pp. 188, 280.  Sonnenlitter missed his January 12, 2007 appointment with Dr. Coleman.  Tr. at 188.  He subsequently became increasingly depressed, used alcohol, and began giving away his possessions or selling them for nominal sums.  Tr. at 188, 321.  He twice attempted

2

suicide by taking Trazadone and Sominex.  Tr. at 188, 209.  His mother and his landlord, a retired physician, became concerned about his behavior and suicidal ideation, and he was convinced to seek help.  Tr. at 188.

On January 30, 2007, Sonnenlitter was admitted to St. Elizabeth's Hospital, then transferred to St. Joseph Health Center in Warren, Ohio ("St. Joseph's") the following day.  Tr. at 321-24.  Upon admission, Sonnenlitter stated that he had been a heavy drinker from 1980 to 1990, then stopped drinking alcohol but used crack cocaine from 1990-94.  According to Sonnenlitter, he then stopped doing drugs or alcohol until 2002-04, when he twice used cocaine and resumed social drinking.  He denied any current use of drugs or alcohol.  On admission, he tested positive for benzodiazepines and stated that he was given sleeping pills in the form of temazepam.  He tested negative for other drugs.  He was then prescribed Paxil and Wellbutrin, but he stated that he did not believe that these drugs made any difference.  Both his father and his daughter have been treated for depression.

The  admitting physician at St. Joseph's, Harrish Patel, M.D., found Sonnenlitter's behavior and attitudes to be appropriate but with restricted affect.  Dr. Patel described Sonnenlitter as co-operative and exhibiting rambling speech that was within normal limits for rate and volume.  Sonnenlitter admitted to being depressed but denied perceptual disturbances.  Dr. Patal also found Sonnenlitter's thoughts to be disorganized and full of paranoia.  Sonnenlitter was oriented as to time, place, and person; had decreased memory and concentration; and exhibited poor impulse control, insight, and judgment.  Sonnenlitter admitted difficulties in maintaining personal relationships but denied aggressive behaviors.  Dr. Patel diagnosed Sonnenlitter as

3

then suffering from bipolar schizophrenic disorder in its depressed phase and assigned him a current Global assessment of Functioning ("GAF") of 30.[1]  He prescribed Depakote and Zyprexa.

Sonnenlitter was transferred to the Veterans' Administration ("VA") hospital in Brecksville ("VA Hospital").  Tr. at 188-90.  At the VA Hospital, Sonnenlitter participated in group activities and had an altered medication regimen.  By discharge, his mood had improved, he was future-oriented, his behavior was appropriate, and he was motivated to participate in treatment.  Upon discharge, his medications included acetaminophem, ibuprofen, loperamide hydrochloride, hydrochlorothiazide, venlafaxine hydrochloride, and omeprazole.  Follow-up appointments were scheduled.  At the time of discharge, was assigned a GAF of 60.[2]  Tr. at 213, 263, 376.

On February 22, 2007, Patricia P. Karpenko, a rehabilitation technician, entered a psychiatric note assessing Sonnenlitter's condition.  Tr. at 278-82.  Sonnenlitter tested negative for alcohol use and reported using alcohol monthly or less and having three or four drinks when he drank.  He admitted current tobacco use.  He stated that in the past two weeks he had experienced several days on which he had little interest or pleasure in doing things and several days on which he had felt down or depressed.  He denied a need for help with substance abuse and was defensive on the subject of alcohol or drug

---

[1]  A GAF of between 21 and 30 indicates behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (*e.g.*, sometimes incoherent , acts inappropriately, suicidal preoccupation) or inability to function in almost all areas (*e.g.*, stays in bed all day, no job, home, or friends).

[2]  A GAF of between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

4

problems, but he admitted needing financial help.  He also said that depression medications were helping him to feel better.  Sonnenlitter reported that he lived with his parents, did not socialize with friends, was divorced with a 20-year old daughter, and had trouble keeping a job because of "stress and people."  Tr. at 281.  Karpenko noted that Sonnenlitter had been assigned a GAF of 50.[3]  An alcohol screening test administered on February 27, 2007 in conjunction with a follow-up examination was negative.  Tr. at 204.

On March 2 and 5, 2007, Sonnenlitter reported that he did not feel suicidal or homicidal, and he rated his mood as a five out of ten.  Tr. at 209-13, 264-66.  He thought that his current prescription for Venlafaxine was effective in improving his mood. Sonnenlitter stated that he was eating better and was talking walks.  He also reported that he had joined the YMCA and was enjoying playing basketball.

On April 25, 2007, Sonnenlitter reported to the outpatient clinic and reported increased depression, probably because he had no income. Tr. at 397-99.  He rated his depression as a seven on a ten point scale.  Sonnenlitter stated that he was living with a friend instead of his parents and was waiting to take vocational tests that would rate his aptitudes.  Nevertheless, Sonnenlitter exhibited good insight and judgment, good attention and concentration, organized thoughts, and an even, stable mood.  He was completely oriented and free of suicidal or homicidal ideation.

On May 11, 2007, state agency psychologist, Alice Chambly, Psy.D., reviewed

---

[3] A GAF of between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

Sonnenlitter's record and completed a Psychiatric Review Technique and Mental Residual Functional Capacity Evaluation.  Tr. at 340-57.  Dr. Chambly found Sonnenlitter to be suffering from severe, recurrent major depression which resulted in mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and one or two episodes of decompensation, each of extended duration.  She also opined that Sonnenlitter was moderately limited in his abilities to carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, interact appropriately with general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  Dr. Chamblys opined that Sonnenlitter "would be capable of simple and multi-step tasks in a low stress environment with no interaction with the general public and limited, superficial interaction with coworkers."  Tr. at 342.  On November 12 2007, state agency psychologist, Tonnie Hoyle, Psy.D., affirmed Dr. Chambly's opinion.  Tr. at 436.

On June 27, 2007, Nurse Bateman spoke to Sonnenlitter on the telephone.  Tr. at 390.  Nurse Bateman thought that Sonnenlitter should attend mood management classes at the outpatient clinic where he had been seeing her.  She also urged him to apply for enrollment at the Ohio Bureau of Vocational Resources.  She noted that Sonnenlitter was scheduled to move into new apartments at the end July, which would give him more privacy, and that he sounded upbeat.

On June 18, 2007, Sonnenlitter reported to clinical social worker George L. Otto, LISW, the he was staying at Meridian Services ("Meridian") and finding it difficult to live

6

there.  Tr. at 396.  He reported that he had been turned down for social security and that his medications were not working.  He said that he was being treated for substance abuse problems that he had not experienced in twelve years.  He also resented being ordered to attend spirituality classes.  He was not receiving mental health counseling at Meridian and was suffering from low self-esteem and depression.  He stated that he did not want to do factory or warehouse work anymore.

On June 26, 2007, Sonnenlitter reported that he was living in a boarding house and was not doing well.  Tr. at 392-94.  According to Sonnenlitter, he could not stand to hear certain people's voices and had no support system.  He admitted suicidal ideation but no suicidal plans.  He said that he was very depressed, not sleeping well, and tired of living.  Sonnenlitter rated his depression as eight or nine on a scale of ten. Sonnenlitter displayed poor eye contact and slowed speech, and he appeared depressed and irritable.  He was alert and oriented, however, with coherent, logical, and goal-directed thought.  Mirtazipine was added to his current daily dose of effexor.

On November 21, 2007, Dr. Prabhudas Lakhani examined Sonnenlitter at the request of Disability Determination Services ("Bureau").  Tr. 437-44.  Sonnenlitter's weight was 326 pounds.  Examination revealed that the range of motion in Sonnenlitter's joints and his muscle strength were essentially normal.  There were no muscle spasms, spasticity, clonus, primitive reflexes, muscle atrophy, or edema.  Dr. Lakhani found crepitation with movement in both knees, and Sonnenlitter reported moderate tenderness at the medial aspect of the left knee.  Sonnenlitter also reported pain in the right lumbosacral area at 60○ left leg raising.  In addition, Sonnenlitter told Dr. Lakhani that he experienced pain at lifting more than 30 pounds or lifting overhead,

7

that he had experienced low back pain for 18 years, and that bending or walking half a mile was painful.  He also reported that he was able to sit for four to seven hours but that after standing for one or two hours he had to sit.  Sonenlitter walked normally, and x-rays of the knees and back detected no abnormalities.  Sonnenlitter's memory, concentration, and understanding were good.  Dr. Lakhani diagnosed degenerative disease, possibly of the knees and spine; morbid obesity; gastroesophogeal reflux disease; hyperlipidemia; depression; hypertension; and possible capsulitis in the right shoulder.  In conclusion, Dr. Lakhani wrote, "Based on objective findings, this gentleman can do the activities in walking, sitting and standing as mentioned above." Tr. at 444.

On March 7, 2008, Sonnenlitter was admitted to Northside Hospital after taking 63 15 mg pills of temazepam in a failed suicide attempt.  Tr. at 519-22.  He was transferred to the VA Hospital the following day for psychiatric evaluation.  Clinical notes describe Sonnenlitter as depressed, tearful, hyperverbal, and occasionally expressing tangential thought.  Sonnenlitter reported poor sleep, worsening mood, decreased energy and concentration, and reduced physical activity for several weeks.  He admitted thoughts that "don't seem like they are mine," tr. at 520, and expressed manic responses and ideas of reference.  Sonnenlitter stated that he wanted to make the behavioral changes necessary to bring his life under control but did not know how to do it.  He initally denied alcohol use, but he eventually admitted that he had been drinking since Christmas and had not been fully compliant with his medications.  The VA Hospital discharged Sonnenlitter on March 14, 2008 in fair condition.  Upon discharge, his medications included Lisinopril, Omeprazole, Trazodone, and velafaxine, and he

8

was assigned a GAF of 55.

Sonnenlitter was again admitted to the VA hospital from December 30, 2008 through January 6, 2008. Tr. at 513-17. His caseworker advised him to come to the VA hospital for evaluation, and he was angry at being involuntarily admitted for safety and stabilization. The attending physician diagnosed mood and personality disorders with borderline and antisocial features. Sonnenlitter admitted recent alcohol use and "second-hand" marijuana exposure. He described very stressors that were causing him problems, including alleged abandonment by his parents. He also reported mood swings, reduced sleep, and adequate or high energy. Sonnenlitter believed that he might be bipolar and denied that his mood changes might be due to alcohol. Upon discharge, he promised to follow a substance-free lifestyle and was assigned a GAF of 45.

On January 18, 2009, Sonnenlitter became upset because his girlfriend, a prostitute, was with another man. Tr. at 457-74. He began tearing up his apartment and his hallway. The landlord called the Cleveland police, who brought him to the MetroHealth Hospital emergency room, where he was admitted and, after creating a disturbance at the hospital, restrained. Sonnenlitter was medicated and removed from restraints. The attending physician evaluated him as bipolar, manic, and a risk to others, and his toxicology screen was negative. MetroHealth Hospital assigned him a GAF of 11-20 and transferred him to the VA hospital.[4]

---

[4] A GAF of 11-20 indicates that the subject constitutes some danger to himself or others (*e.g.*, suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (*e.g.*, smears feces) or gross impairment in communication (*e.g.*, largely incoherent or mute).

9

When he entered the VA hospital, Sonnenlitter was dysphoric, lethargic, and labile with disorganized and tangential thought.  Tr. at 509-13.  The attending physician adjusted his medication.  Over the next few days, Sonnenlitter missed therapy appointments and was generally uncooperative and disruptive.  When the VA hospital believed that he was no longer a threat to himself or others, it released him, as he would not participate in treatment or abide by hospital rules.  He was assigned a GAF of 42.

On January 30, 2009, Sonnenlitter exhibited erratic behavior at a medical appointment and was admitted to the psychiatric ward at a VA clinic.  Tr. at 505-06.  He was diagnosed as suffering from a substance induced mood disorder consequent upon alcohol, caffeine, and marijuana abuse and exhibiting a borderline personality disorder with antisocial personality traits.  Sonnenlitter admitted abusing his prescribed medication; selling some of his medications; using alcohol and marijuana the day before his admission; using caffeinated energy drinks; and not being compliant with scheduled medications.  He showed no remorse for his behaviors.  The treating physician adjusted Sonnenlitter's medications, including tapering him off anti-depressants.  Upon discharge on February 9, 2009, Sonnenlitter reported some depression and anxiety and exhibited poor insight and limited judgment.  However, his thoughts were organized, goal directed, and future oriented without suicidal or homicidal ideation.  He was assigned a GAF of 42.

Sonnenlitter stopped using alcohol and illegal drugs on April 1, 2009.  Tr. 31, 682.  On July 27, 2009, his clinical social worker noted that Sonnenlitter's mood had improved, his thought processes were organized and future-oriented, and he had done well in group therapy.  Tr. 550-51.  The social worker noted some residual memory

10

problems, however.

On October 7, 2009, psychologist, Dr. Richard Litwin, Ph.D., examined Sonnenlitter at the request of the Bureau.  Tr. at 636-39.  Dr. Litwin noted that Sonnenlitter was living at a mental health residential facility where he was offered a high level of emotional support.  Sonnenlitter told Dr. Litwin that he had been abusing alcohol until March of 2009.  After administering various tests, Dr. Litwin reached the following conclusions:

> Ed is a bright individual with well balanced intellectual abvilities.  His IQ scores suggest good potential to learn and master fairly challenging cognitive tasks, with excellent potential for training at the skilled vocational or even college level.
>
> *        *        *        *
>
> Ed has strong aptitude levels.  Basic academic skills fell at the late high school level or above.  He appears to have a strong aptitude for learning and functioning in a fairly challenging position.
>
> *        *        *        *
>
> Ed noted a high level of functional difficulty with staying focused, working memory, planning/organization, memorization and experiencing cognitive interference from affective symptoms.  His test scores suggest attention deficit disorder with inattentive features.
>
> *        *        *        *
>
> Ed continues to report at least moderate difficulty with depression, anxiety, and discomfort around others.  Complaints about poor concentration and memory were also apparent.  No suicidal ideation was noted though some hopelessness about the future remains along with feelings of worthlessness.

Tr. at 637-38.  Dr. Litwin suspected that "many of [Sonnenlitter's] symptoms are best explained by his bipolar disorder and history of drug/alcohol abuse."  Tr. at 639.  He opined that Sonnenlitter needed a highly structured work setting and would work best in small groups with a few identified tasks.  He recommended that Sonnenlitter avoid odd

11

shifts, long hours, large groups, external pressures, high levels of stimulation or distraction, and tasks that are detail oriented or require ongoing learning and memorization.  Dr. Litwin diagnosed Sonnenlitter as suffering from ADHD, anxiety, bipolar disorder, and alcohol abuse in remission, and he assigned Sonnenlitter a GAF of 60.

Clinical notes between November 2009 and July 2010 reflect continued progress toward rehabilitation.  Tr. at 209, 545, 665-68, 676, 692, 698, 707, 716.  In November 2009, nurse Ingrid V. Barcelona opined that Sonnenlitter was not a risk to himself or others and assigned him a GAF of 65.  Sonnenlitter became very involved in church, volunteered for church activities, and exercised.  He completed two job interviews and began working part-time at a bakery.  Sonnenlitter reported that he was satisfied with his job, was getting along with others at the job, and had received positive feedback from a supervisor.  Sonnenlitter exhibited no behavioral problems.

*C.     Hearing Testimony*

On October 21, 2010, Sonnenlitter testified at his administrative hearing that he suffered from fear and anxiety among unfamiliar people but was trying to change that by forcing himself to be more social.  Tr. at 30-31.  He reported that he was still sober as of April 1, 2009 but that he did not attend AA meetings because he did not entirely agree with the group's religious doctrines.  Tr. at 31.  He told the court that he was currently taking a generic form of Celexa, Divalproax, Lisinopril, Omeprazole, and Ambien.  Other than weight gain, he reported no side effects from his medications and said that his mood was the most stable within memory.  Tr. at 31-32.  Sonnenlitter lost his job at the bakery, however, as a result of hospitalization due to pancreatitis.  Tr. at 32-33.

Sonnenlitter testified that in an average day, he prepares his own food, maintains his apartment, takes a walk, participates in church activities, and exercises.  Tr. at 33-34.  He stated that he believed he was still disabled because he believes that the anxiety and stress of a 40-hour a week job would cause him to revert to his old behaviors.  Tr. at 34.  His job at the bakery was suitable because he could work at his own pace and did not have to deal with anyone but his supervisor.  Tr. at 34-35. Sonnenlitter no longer has a driver's license because he could no longer afford it, but he uses buses and has friends and social workers drive him to important appointments. Sonnenlitter also testified that he was seeing a psychiatrist and a nurse/social worker regularly and a psychologist occasionally.  Tr. at 40.

D.    Interrogatory to the VE

After the hearing, the ALJ sent the record to the VE and propounded a series of interrogatories related to Sonnenlitter's ability to perform substantial gainful activity.  Tr. at 168-74.  The ALJ presented the VE with three hypothetical questions.  First, the ALJ asked the VE to assume a hypothetical individual born on December 14, 1963, who has at least a high school education, is able to communicate in English, has Sonnenlitter's work experience, and a residual functional capacity to perform a full range of medium work.  The ALJ then asked if such an individual could perform any of Sonnenlitter's past relevant work.  The VE responded that such an individual could perform the jobs of kitchen helper, industrial truck operator, and cook's helper.[5]

The ALJ also asked the VE to assume an individual with Sonnenlitter's education

---

[5]  The ALJ also asked if such an individual could perform other, unskilled jobs in the national economy, and the VE listed several jobs that such an individual could perform.

and work experience and no exertional limitations but with the following non-exertional limitations:  marked inability to maintain social functioning; marked inability to maintain concentration, persistence, and pace; cannot respond appropriately to supervision, co-workers, and usual work situations; cannot deal with changes in a routine work setting; cannot make judgments that are commensurate with the functions of unskilled work; can do no complex tasks but can do simple, routine tasks; can only do low-stress work; can do no work involving arbitration, confrontation, or negotiation; can only have superficial interpersonal interaction with co-workers and supervisors; and can have no interaction with the public.  When asked, the VE opined that there was no substantial gainful employment for such an individual.

Finally, the ALJ asked the VE to again assume an individual with Sonnenlitter's education and past relevant work and having no exertional limitations but with the following non-exertional limitations:  moderate inability to maintain social functioning; slight inability top maintain concentration, persistence, and pace; can respond appropriately to supervision, co-workers, and usual work situations; can deal with changes in the work setting; can make judgments that are commensurate with the functions of unskilled work; can do complex and simple routine tasks; can only do low-stress work; and can do not work involving arbitration, confrontation, or negotiation. The VE then asked if such an individual could perform Sonnelitter's past relevant work or any other work in the national economy.  The VE responded that such an individual could perform Sonnenlitter's past relevant work as a kitchen helper, cook's helper, and industrial cleaner.

14

III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second,  the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent his from doing his past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent his from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.

15

1990).

## IV.  Summary of Commissioner's Decision

In determining that Sonnenlitter was not disabled, the ALJ made the following relevant findings:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.  The claimant has not engaged in substantial gainful activity since June 30, 2006, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.930(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  arthropathy, affective disorder, alcoholism in sustained remission. [20 CFR 404.1520(c) and 416.920(c)].

4.  The claimant's impairments, including the substance use disorder, meet sections 12.04 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 [20 CFR 404.1520(d) and 416.920(d)].

5.  If the claimant stopped the substance abuse, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore the claimant would continue to have a severe impairment or combination of impairments.

6.  If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments in 20 CFR Part 404, Subpart P, Appendix 1 [20 CFR 404.1520(d) and 416.920(d)].

7.  If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform full range of work at all exertional levels but with the following non-exertional limitations:
a.  The claimant has moderate inability to maintain social function;
b.  He has slight inability to maintain concentration, persistence and pace;
c.  He can perform both complex and simple routine tasks;
d.  He can only do low stress work, including no work with production quotas or piece rate work;
e.  He can do no work involving arbitration, confrontation, or negotiation.

8.  If the claimant stopped the substance use, the claimant would be able to perform some past relevant work (20 CFR 404.1565 and 416.965).

16

9.  The claimant was born on December 14, 1963 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

10.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

11.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12.  If the claimant stopped the substance use, considering the claimant's age, education, work experience and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

13.  Because the claimant would not be disabled if he stopped the substance use [20 CFR 404.1520(g) and 416.920(g)], the claimant's substance use disorder is a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935).  Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

Tr. at 9-25.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

VI.  Analysis

Sonnenlitter alleges that the ALJ (1) erred in determining that Sonnenlitter's prior

drug and alcohol use was material to the determination of disability and (2) improperly

assessed Sonnenlitter's residual functional capacity ("RFC").  The Commissioner denies

that the ALJ erred.

A.    *Whether the ALJ erred in determining that Sonnenlitter's prior drug and alcohol*
      *use was material to the determination of disability*

Sonnenlitter contends that the ALJ improperly determined that Sonnenlitter's

substance abuse was material to the adjudication of disability, for four reasons:  (1) he

had a history of sobriety for 12 years prior to the ALJ's decision; (2) since the alleged

onset date, Sonnenlitter has been a social drinker only; (3) the ALJ misinterpreted Dr.

Litwin's opinion; and (4) the ALJ failed to obtain a necessary medical opinion to

determine Sonnenlitter's functional capacity absent the limiting effects of his substance

abuse.  The Commissioner denies that the ALJ erred.

The Act prohibits an individual from receiving disability benefits if drug or alcohol

abuse is a contributing factor material to the individual's disability.  42 U.S.C. §§

423(d)(2)(C), 1382c(a)(3)(J).  When the ALJ determines that an individual is disabled

and the record demonstrates a history or drug or alcohol abuse, the ALJ must

determine whether the individual's substance abuse is a contributing factor to the

determination of disability and whether the individual would still be disabled if the

substance abuse stopped.  20 C.F.R. §§ 404.1535(a), 416.935(a); *see also* SSR 82-60.

18

If the ALJ determines that a claimant would still be disabled if the substance abuse stopped, the ALJ must conclude that the substance abuse was not a contributing factor material to the determination of disability and should award benefits.  20 C.F.R. §§ 404.1535(b)(ii), 416.935(b)(ii).  But if the ALJ determines that a claimant would not be disabled if the substance abuse stopped, the ALJ must conclude that the substance abuse was a contributing factor material to the determination of disability and should not award benefits.  20 C.F.R. §§ 404.1535(b)(i), 416.935(b)(i).

Sonnenlitter's contentions with respect to his substance abuse are not well-taken.  Sonnenlitter's contention that he was sober for twelve years prior to the ALJ's decision is flatly contradicted by the record.  The record is replete with evidence of Sonnenlitter's alcohol and illegal drug use followed by decompensation:  (1) his January 30, 2007 admission to St. Elizabeth's Hospital after behaving erratically was preceded by alcohol use, and Sonnenlitter denied alcohol use to the admitting physician; (2) his March 7, 2008 admission to Northside Hospital after taking 63 15 mg pills of temazepam in a failed suicide attempt was preceded by Sonnenlitter's drinking since Christmas, and he initially denied alcohol use upon admission; (3) Sonnenlitter's admission to the VA hospital from December 30, 2008 through January 6, 2008 was preceded by recent alcohol use and "second-hand" marijuana exposure, and Sonnenlitter denied that his mood changes might be due to alcohol; and (4) Sonnenlitter's admission to the VA clinic after behaving erratically on January 30, 2009 was preceded by alcohol and marijuana use.  In fact, every episode of decompensation in the record was preceded by alcohol use, usually followed by denials that he was using alcohol or that it was causing his problems.  In addition, Sonnenlitter himself

19

contended that he had been sober since April 1, 2008, not earlier.  Finally, Sonnenlitter told Dr. Litwin that he had been abusing alcohol up to March 2009.  The ALJ's conclusion that Sonnenlitter's periods of decompensation and erratic behavior occurred in conjunction with alcohol abuse is supported by overwhelming evidence.

Sonnenlitter also contends that he has merely been a social drinker since the alleged onset date, as evidenced by statements to that effect prior to April 1, 2008.  As the above record demonstrates, Sonnenlitter's statements regarding his drinking have been contradictory.  Sonnenlitter told Dr. Litwin in October 2009 that he abused alcohol until March 2009, and he testified under oath at his hearing that he had been sober only from April 1, 2009.  The ALJ was entitled to believe those statements rather than earlier denials of alcohol use or contentions that he had been merely a social drinker.

Sonnenlitter also argues that the ALJ misinterpreted Dr. Litwin's opinion.

Sonnenlitter argues as follows:

> The ALJ claims that Dr. Litwin reported that the "claimant exhibited little sign of a personality disorder and that previous anti-social behavior was likely explained by his alcoholism" (Tr. 17).  This is a distortion, which entirely misstates Dr. Litwin's evaluation.  During his evaluation, Dr. Litwin did report that Plaintiff exhibited little signs of a personality disorder.  He then stated that "many of his [Plaintiff's] symptoms are best explained by his bipolar disorder and history of drug/alcohol abuse" (Tr. 639).  From these two statements, the ALJ extrapolates that Plaintiff would not have marked difficulties in social functioning absent the substance abuse.  The ALJ's rationale is illogical. Dr. Litwin merely expressed that Plaintiff's current symptoms were explained by his bipolar disorder and *history* of drug and alcohol abuse.  Given that Plaintiff was sober at the time of the exam, and Dr. Litwin reported this sobriety, the only proper conclusion is that the *history* of drug and alcohol abuse, rather than current use, contributed to Plaintiff's current symptoms.  Moreover, the ALJ ignores that Dr. Litwin also stated Bipolar as a cause of the symptoms.

Plaintiff's brief at 9 (emphasis in the original).

Sonnenlitter misunderstands the ALJ's opinion.  The ALJ couches his opinion in

the standard language of an opinion considering the impact of drug and alcohol abuse ("DAA") on a claimant's disability.[6]  That language uses the conditional voice (*e.g.*, "*if* the claimant *were* to stop alcohol abuse . . . ").  While the ALJ's language is awkward and confusing, it is nevertheless clear the ALJ recognizes that Sonnenlitter has been sober since April 1, 2009.  In his assessment of Sonnenlitter's residual functional capacity absent alcohol abuse, the ALJ repeatedly begins each paragraph with the conditional voice (*e.g.*, "If the claimant stopped substance abuse") followed by a statement assessing Sonnenlitter's resulting capabilities.  As evidence supporting each assessment, the ALJ uses examples of Sonnelitter's post-April 1, 2009 behaviors.  For example, the ALJ stated, "As for episodes of decompensation, the claimant would experience no episodes of decompensation if the substance abuse were stopped.  The claimant has not had a period of decompensation since his sobriety."  Tr. at 17.  Thus, the ALJ recognizes that Sonnenlitter has, indeed, stopped substance abuse.  Given the dates of the behaviors selected as exemplifying Sonnenlitter's substance abuse-free behavior, it is clear that the ALJ implicitly accepts Sonnenlitter's testimony that he has been sober since April 1, 2009.  *See* tr. at 16-19.  Sonnenlitter is correct, however, in his assertion that the ALJ misstated Dr. Litwin's opinion one respect.  Dr. Litwin stated that "many of [Sonnenlitter's] symptoms are best explained by his bipolar disorder and history of drug/alcohol abuse."  Tr. at 639.  The ALJ only noted substance abuse as a

---

[6]  *See, e.g.*, the language of Social Security Ruling ("SSR") 82-60:  "[T]he key issue is whether the individual would continue to meet the definition of disability even if drug and/or alcohol use were to stop" and  "[t]he drug addiction and alcoholism requirements are imposed only where . . . the same impairment(s) would no longer be found disabling if the individual's drug addiction or alcoholism were eliminated."  SSR 82-60, www.ssas.com.

cause of Sonnenlitter's symptoms.  Tr. at 17.

Finally, Sonnenlitter errs in asserting that the ALJ was required to obtain a medical opinion to determine what Sonnenlitter's functional capacity would be after removing the effects of his substance abuse.  Sonnenlitter quotes SSR 82-60, asserting "adequate information must be obtained to permit proper evaluation of the individual's impairment(s). . . . if sufficient evidence for a decision is not available . . . an additional medical examination is necessary."  An additional medical opinion is not required, however, when an individual claiming mental impairments has been in sustained remission from substance abuse.  Emergency Message ("EM") 96200, August 30, 1996 (at **www.ssas.com**), recommends that if a claimant alleges mental disability during a period when the claimant has been abusing alcohol or illegal drugs, the ALJ must first determine if the claimant was disabled during the period of DAA.  If the ALJ concludes that the claimant was disabled, then the ALJ must determine whether the claimant would have been disabled absent DAA.  Where a claimant has been continuously abusing alcohol and illegal drugs, the opinion of a physician or psychologist is needed to determine the claimant's capacities without DAA.  But when an individual has had a period of sustained remission, the most useful evidence in disentangling the effects of substance abuse from the effects of other mental impairments is evidence regarding the individual's capabilities in the "period when the individual was not using drugs/alcohol." EM 96200 at Q.17.

In the present case, the ALJ found that Sonnenlitter was disabled during the period that he was abusing alcohol and illegal drugs, then disentangled the effects of substance abuse by evaluating Sonnenlitter's functional capacity during his period of

sobriety. The ALJ determined that when Sonnenlitter was not abusing alcohol or illegal drugs, he has a moderate inability to maintain social function; a slight inability to maintain concentration, persistence and pace; can perform both complex and simple routine tasks; can only do low stress work, including no work with production quotas or piece rate work; and can do no work involving arbitration, confrontation, or negotiation. The ALJ concluded from this assessment of Sonnenlitter's RFC that Sonnenlitter was capable of performing some past relevant work and, therefore, was not disabled when he was not abusing alcohol and illegal drugs. This analysis comports with the requirements of EM 96200. The ALJ was not required, therefore, to obtain an additional medical opinion to determine Sonnenlitter's residual functional capacity without DAA.

For the reasons given above, Sonnenlitter's contention that the ALJ erred in determining that Sonnenlitter's prior drug and alcohol use was material to the determination of disability is not well-taken.

B.    *Whether the ALJ improperly assessed Sonnenlitter's RFC*

Sonnenlitter also contends that the ALJ erred because he improperly assessed Sonnenlitter's RFC. In particular, Sonnenlitter contends that the ALJ (1) misstated the opinion of Dr. Lakhani and failed to include Dr. Lakhani's actual opinion as to Sonnenlitter's physical limitations in the ALJ's decision and (2) failed to include Dr. Litwin's assessment of Sonnenlitter's mental limitations in his decision.

Sonnenlitter argues that because the ALJ gave significant weight to the opinion of Dr. Lakhani, he was inconsistent in disregarding the limitations found by Dr. Lakhani in the ALJ's assessment of Sonnenlitter's RFC. In particular, the ALJ found that Sonnenlitter was capable of all exertional levels of work without further physical

23

limitations.  According to Sonnenlitter, this is inconsistent with granting significant weight to Dr. Lakhani's opinion:

> The inconsistency arises from the fact that Dr. Lakhani reported that Mr. Sonnenlitter suffered from degenerative joint disease in the knees and disc disease in the lumbar spine and assessed several exertional limitations (Tr. 443). The ALJ claims that "Dr. Lakhani opined that the claimant could walk, sit and stand normally" (Tr. 19).  This wholly misstates Dr. Lakhani's opinion.

Plaintiff's Brief at 13.

Sonnenlitter's interpretation of Dr. Lakhani's opinion is not the only interpretation possible.  After examining Sonnenlitter, Dr. Lakhani determined that the range of motion in Sonnenlitter's joints and his muscle strength were essentially normal.  He found no muscle spasms, spasticity, clonus, primitive reflexes, muscle atrophy, or edema.  X-rays of Sonnenlitter's knees were normal, and x-rays of his spine showed moderate narrowing of the joint space but no abnormalities.  Gait and ambulation were normal.  The only abnormality that Dr. Lakhani detected was crepitation with movement in both knees.  All of Sonnenlitter's allegations of pain were unsupported by objective medical signs:  moderate tenderness at the medial aspect of the left knee; pain in the right lumbosacral area at 60◦ left leg raising; pain at lifting more than 30 pounds or lifting overhead; low back pain for 18 years; and pain upon bending or walking half a mile was painful.  Sonnenlitter's claimed postural limitations, including an inability to sit for more than four to seven hours or stand for more than one or two hours, were equally unsupported by objective medical findings.

Dr. Lakhani did not clearly opine that Sonnenlitter had degenerative joint disease in his knees and back or that he had any physical functional limitations.  In diagnosing Sonnenlitter, Dr. Lakhani wrote, "Degenerative joint disease, possibly of the knees

24

mostly and to some extent maybe in the lumbar spine."  Tr. at 443.  This hardly

constitutes an assured diagnosis of degenerative joint disease in the knees and spine.

Dr. Lakhani's opinion regarding Sonnenlitter's postural limitations is even more

equivocal.  Dr. Lakhani wrote, "*Based on objective findings*, this gentleman can do the

activities in walking, sitting and standing as mentioned above."  Tr. at 444 (emphasis

added).  It is unclear whether this conclusion adopts Sonnenlitter's claimed limitations or

whether it simply means that Sonnenlitter can walk, sit, and stand without limitation, as

indicated by the objective medical evidence.  The ALJ was entitled not to adopt

Sonnenlitter's alleged limitations into his decision in the absence of a clear opinion from

Dr. Lakhani accepting those limitations.[7]  Sonnenlitter's contention that the ALJ's

opinion is inconsistent, therefore, is not well-taken.

Sonnenlitter also contends that the ALJ erred in his treatment of Dr. Litwin's

opinion.  According to Sonnenlitter, even though the ALJ said that he gave Dr. Litwin's

opinion great weight, he failed to incorporate all of Dr. Litwin's findings regarding

Sonnenlitter's mental limitations in his decision.

Dr. Litwin found that Sonnenlitter suffered from ADHD, a generalized anxiety

disorder, bipolar II disorder, and alcohol dependence in sustained remission.  He also

found that Sonnenlitter had difficulties with memory and concentration and some

---

[7]  In addition, it is worth noting that Sonnenlitter told Dr. Lakhani in 2007 that he had
been suffering back pain for 18 years.  Thus, he had been experiencing back pain while he
was performing much of his past relevant work.  Moreover, Sonnenlitter reported playing
baseball and basketball within six months of Dr. Lakhani's examination, which would be
inconsistent with serious back and knee problems.  Finally, as the ALJ noted, there is
nothing in the record to indicate that Sonnenlitter has sought any treatment for his alleged
knee and back problems.  Tr. at 19.

weakness in higher level cognitive functioning, which was consistent with ADHD.  Dr.

Litwin further found that Sonnenlitter was "bright . . . with well balanced intellectual

abilities" with "a good potential to learn and master fairly challenging cognitive tasks . . .

."  Tr. at 637.  He opined that Sonnenlitter needed a highly structured work setting and

would work best in small groups with a few identified tasks.  He recommended that

Sonnenlitter avoid odd shifts, long hours, large groups, external pressures, high levels

of stimulation or distraction, and tasks that are detail oriented or require ongoing

learning and memorization.

In his opinion, the ALJ determined that Sonnenlitter had the following RFC,

disregarding the effects of DAA:

> If the claimant stopped the substance use, the claimant would have the residual
> functional capacity to perform full range of work at all exertional levels but with
> the following non-exertional limitations:
>     a.  The claimant has moderate inability to maintain social function;
>     b.  He has slight inability to maintain concentration, persistence and pace;
>     c.  He can perform both complex and simple routine tasks;
>     d.  He can only do low stress work, including no work with production
>     quotas or piece rate work;
>     e.  He can do no work involving arbitration, confrontation, or negotiation.

Tr. at 17.  The ALJ followed this assessment with an examination of Sonnenlitter's

activities since his sobriety and the opinions of various medical sources.  Tr. at 18-19.

Sonnenlitter argues that the ALJ failed to include in his decision Dr. Litwin's

opinion that Sonnenlitter should avoid working in large groups, working with high levels

of stimulation and distraction, and having more than a few identified tasks.  According to

Sonnenlitter, the ALJ's opinion encompasses "a broader range of work than Dr. Litwin

imagined."[8]  Tr. at 15.

As the Commissioner points out, however, the fact that the ALJ gave Dr. Litwin's opinion great weight does not mean that the ALJ must, therefore, adopt every limitation found by Dr. Litwin.  Dr. Litwin's restrictions regarding stimulation and distraction are reflected in the ALJ's opinion that Sonnenlitter has slight inability to maintain concentration, persistence and pace; the restriction that Sonnenlitter should work with a few identified tasks is reflect in a restriction to routine tasks.  Dr. Litwin's restriction that Sonnenlitter avoid external pressures is included in the ALJ's finding that Sonnenlitter "can only do low stress work, including no work with production quotas or piece rate work . . . ."  In addition, the Commissioner contends that although the ALJ did not include in his RFC Dr. Litwin's opinion that Sonnenlitter should avoid large groups, the past relevant work that the ALJ found Sonnenlitter to be capable of performing, kitchen helper and cook's helper, does not require Sonnenlitter to work with large groups. Thus, according to the Commissioner, even if this omission was error, it was harmless error.  Sonnenlitter does not challenge this contention.

In sum,  the ALJ was not required to adopt all of the limitations found by Dr. Litwin merely because he gave Dr. Litwin's opinion great weight.  In addition, the ALJ included many of Dr. Litwin's restrictions in his assessment of Sonnenlitter's RFC, and the exclusion of one of Dr. Litwin's limitations was harmless.  Thus, Sonnenlitter's

---

[8] Sonnenlitter also contends that the ALJ's RFC does not "fully incorporate Plaintiff's limitations with working with the public, or with coworkers or supervisors."  Tr. at 15.  Dr. Litwin did not opinion that Sonnenlitter had limitations with working with the public, coworkers, or supervisors.

contention that it was contradictory for the ALJ to give Dr. Litwin's opinion great weight and then not include all of Dr. Litwin's assessment of Sonnenlitter's limitations in the ALJ's RFC is not well-taken.

Finally, Sonnenlitter's exclusive focus on the ALJ's handling of the opinions of Drs. Lakhani and Litwin avoids the larger question:  whether the ALJ's determination of Sonnenlitter's RFC was supported by substantial evidence in the record as a whole. Sonnenlitter says nothing about his activities of daily living, his response to medications, the opinions of other medical professionals, and Sonnenlitter's own statements in the record regarding his capabilities.  These factors, too, must be considered in determining whether the ALJ's opinion was supported by substantial evidence.  Sonnenlitter does not challenge any of these, which do, in fact, support the ALJ's opinion.

For the reasons given above, Sonnenlitter's contention that the ALJ's assessment of Sonnenlitter's RFC was not supported by substantial evidence is not well-taken.

VII.  Decision

For the reasons set forth above, the court **AFFIRMS** the opinion of the Commissioner.

**IT IS SO ORDERED.**


Date:  October 9, 2012                    *s/ Nancy A. Vecchiarelli*
                                          Nancy A. Vecchiarelli
                                          U.S. Magistrate Judge


28